201 So.2d 257 (1967)
HALIFAX HOSPITAL DISTRICT, Appellant,
v.
Bobby F. DAVIS, Appellee.
No. I-248.
District Court of Appeal of Florida. First District.
July 18, 1967.
Rehearing Denied August 8, 1967.
Green & Strasser, Daytona Beach, for appellant.
Ossinsky & Krol, Daytona Beach, for appellee.
RAWLS, Judge.
In this malpractice suit, Appellant Halifax Hospital District seeks reversal of a judgment entered upon a jury verdict in favor of Plaintiff Bobby F. Davis.
Appellant's points on appeal are summarized as follows:
1. Plaintiff failed to establish by competent evidence that defendant's resident physician breached accepted standards of medical practice in the community.
2. Plaintiff failed to prove the proximate cause of his injuries.
3. Plaintiff, a lay witness, should not have been allowed to express his opinion as to the cause of tetanus.
On Sunday, May 27, 1962, Appellee-plaintiff Davis incurred injuries as a result of encountering an oyster shell bed while water skiing. The most serious injuries were to his left leg. Davis was carried to Appellant Hospital, where its resident physician, Dr. Ovella, a Cuban refugee, (who was not licensed to practice in Florida) treated his wounds in the emergency room, sent him home with instructions to stay off the leg and to see another doctor on the following Wednesday. It is undisputed that Davis told Dr. Ovella he had been previously immunized for tetanus, and a "booster" (tetanus toxoid) shot was given him. A few days later Davis saw Dr. D  who removed the stitches and changed the bandages. When his leg worsened, Dr. D  directed him to have x-rays made, and these revealed "* * * small bits of opaque material * * * just superior to the patella in the soft tissues which are compatible with slightly opaque foreign bodies." Davis then developed trouble with his jaw, was hospitalized and his illness was diagnosed as *258 tetanus. Davis subsequently instituted this suit upon the theory that the hospital employee, Dr. Ovella, negligently failed to render proper treatment to him in the emergency room by failing to clean an open wound of foreign matter (oyster shells) which negligence resulted in his suffering from tetanus.
Davis relied primarily upon the x-rays and his own testimony to prove the allegations in his complaint. He testified that Dr. Ovella failed to clean all fragments of oyster shells from his wounds, did not x-ray his leg in order to detect such foreign matter, and that his lock jaw ailment resulted from the fragments of shell embedded in the wound. Davis argues that the lack of care in the emergency treatment rendered by Dr. Ovella is of such nature as to be within the comprehension of laymen and required only common knowledge and experience to understand and render judgment upon same. He concludes that no expert testimony is needed to show malpractice on the part of Dr. Ovella.
Halifax Hospital contends otherwise. Its only witness was Dr. Ovella who testified that he had a degree as a medical doctor from the University of Havana (Cuba) and had practiced medicine as a staff member of the Hospital of Havana and the American Hospital in Havana prior to "working" in Miami General Hospital and Lakewood General, in Newport News, Virginia. In testifying as to the matter giving birth to this suit, Dr. Ovella stated that Appellee suffered a minor injury consisting of abrasions of the skin and superficial lacerations. In answer to a question as to what he meant by "superficial", he stated that the lacerations were not deep and did not require deep suturing. He further testified that the treatment was routine and explained, "We clean, irrigate the wound, take a look if something is bleeding to see how deep is the wound, the laceration, and we use a furacin dressing, antibiotic ointment, and give a tetanus shot booster." He detailed the treatment rendered to Appellant which followed the above outline of treatment. Dr. Ovella was questioned at length on cross-examination as to whether oyster shell fragments left in a wound would cause tetanus or lock jaw. His repeated replies were to the effect that the foreign bodies (oyster shell fragments) would not cause tetanus because the patient had complete immunization.
The three points on appeal are so intertwined that we will treat them together. After sifting through the testimony submitted to the jury, we find in substance that the plaintiff, a layman unskilled in the science of medicine, testified that he had an accident, went to the Halifax Hospital for treatment, was initially treated by Dr. Ovella, later treated by another physician, and subsequently suffered the ailment of lock jaw. From the plaintiff's standpoint, somebody "goofed"; otherwise, he would not have suffered such a serious illness. On the other hand, the unrebutted medical testimony is that the care and treatment of plaintiff by defendant Halifax Hospital was in accord with sound medical practice.
It is difficult to reconcile the decisions in this jurisdiction concerning the question of when a layman's testimony as to a medical disorder may be pitted against one skilled in the science of medicine. In Crovella v. Cochrane,[1] a malpractice case, plaintiff testified that she had been diagnosed as being pregnant, but when the pregnancy did not proceed in a normal manner, she consulted defendant, a specialist, who after examining her and making certain tests, rendered his opinion that she was not pregnant and told her she might return to work. At a later date, plaintiff suffered a violent vaginal hemorrhage which was diagnosed by another physician as a miscarriage. In sustaining a summary judgment for defendant doctor, this court stated:
"Jurors and courts do not know and are not permitted arbitrarily to say what are *259 the proper methods of diagnosing and treating human ailments, and the opinion testimony of an expert witness, * * * is competent to be received * * *.
* * * * * *
"The affidavit of an expert witness reflects that the defendant followed accepted means and methods of one engaged in his profession and specialty in arriving at the challenged diagnosis.
* * * * * *
"Generally it is the duty of each [specialists and general practitioners in the medical field] to apply to the diagnosis and treatment of his patient the skills, means, and methods that are recognized as necessary to be followed in the particular case according to the standards of those who are qualified by training and experience to perform similar services in the community."
The Florida Supreme Court was confronted with a similar question in Dohr v. Smith.[2] There during an operation two false teeth were dislodged from the patient's bridgework and were later located in her lung. Expert testimony was presented that it was possible to break teeth when using the laryngoscope even when the greatest skill and care were exercised, and there was no evidence that the anesthetist deviated from approved practice. The court, after detailing the factual circumstances surrounding the pre-operational examination by the physician-anesthetist and the anesthetist's responsibilities during the operation, concluded:
"We do not think the appellants should be defeated simply because no expert testified that what happened in this case amounted to negligence on the part of the anesthetist. To repeat, the very caution she undertook to exercise undermines her position. The jury could have decided from common knowledge and experience, regardless of expert testimony, that the patient needlessly suffered from a condition the anesthetist herself sought to prevent. Montgomery v. Stary, Fla., 84 So.2d 34."
In Atkins v. Humes[3] the Florida Supreme Court reviewed a malpractice suit concerning a cast applied to a three year old child's arm by the defendant doctor. Although the expert testimony conflicted as to whether any of the warning symptoms should have been detected by the defendant physician upon visual examination, the depositions of some expert and lay witnesses supported plaintiff's theory that the defendant physician negligently applied a plaster-of-paris cast on the patient's arm and failed to heed the classic symptoms of Volkmann's contracture and failed to bi-valve the cast to remove pressure. Complaints had been made to the doctor of undue pain, the inability to flex her fingers, and excessive swelling  all signs of Volkmann's contracture. It was held that even without medical testimony as to negligence, a jury, composed of laymen, could decide from common knowledge and experience that the treating physician was negligent in not relieving the pressure of the tight cast. The Supreme Court classified the types of malpractice cases and concluded:
"Obviously, except in rare cases, neither the court nor the jury can or should be permitted to decide, arbitrarily, what is or is not a proper diagnosis or an acceptable method of treatment of a human ailment. Cf. Crovella v. Cochrane, Fla. App., 1958, 102 So.2d 307. But jurors of ordinary intelligence, sense and judgment are, in many cases, capable of reaching a conclusion, without the aid of expert testimony, in a malpractice case involving a charge of negligence in the application or administration of an approved medical treatment."
*260 We now revert to the instant facts and ask the ever present question, What did defendant's employee do that he should not have done? or, What did defendant's doctor employee fail to do that he should have done? Assuming, as plaintiff contends that his tetanus resulted from his encounter with the oyster shells, we must of necessity find that competent evidence was submitted to the jury from which it could conclude that Dr. Ovella was negligent in his treatment by either doing something wrong or failing to do something he should have done. Plaintiff insists that a layman could conclude that the doctor should have removed every particle of oyster shell. However, the medical testimony is that the doctor cleaned and irrigated the wound to remove minor particles; that it is not uncommon for small particles to remain in the wound; and that the cleaning of the wound, application of antibiotic ointment, stitching where necessary, injection of a tetanus booster, and recommendation that the patient procure follow-up treatment by his physician, all of which was done, was the "correct medical practice." This testimony has not been contradicted or impeached in any instance.
But says the plaintiff, the jury was well within its rights to conclude that Dr. Ovella should have x-rayed his leg at the time of initial treatment. This supposition is plaintiff's theory of the correct medical practice entirely unsupported by any medical testimony. We observe that plaintiff's physician did not see fit to follow that procedure until the second visit and then did not find it necessary to open up the wound since he was of the opinion at that time that the fragments "would run out."
This record does not disclose competent evidentiary matter upon which a jury could properly reach a decision as to what caused the lock jaw. The only competent evidence in this record is that some opaque particles were left in the wound and these would not cause tetanus. The only legal basis upon which this judgment could be affimed is upon the doctrine of res ipsa loquitur, which is obviously not applicable upon the facts contained in this record.
Reversed with directions that a new trial be granted.
WIGGINTON, C.J., and CARROLL, DONALD K., J., concur.
NOTES
[1] Crovella v. Cochrane, 102 So.2d 307 (Fla.App. 1st, 1958).
[2] Dohr v. Smith, 104 So.2d 29 (Fla. 1958).
[3] Atkins v. Humes, 110 So.2d 663, 81 A.L.R.2d 590 (Fla. 1959).